660 So.2d 1157 (1995)
Gigi ABBO, f/k/a Gigi Briskin, Appellant,
v.
Alan D. BRISKIN, Appellee.
No. 94-1152.
District Court of Appeal of Florida, Fourth District.
September 27, 1995.
*1158 Thomas G. Purdo, Delray Beach, for appellant.
Richard H. Levenstein of Heimberg, Heimberg, Rader & Levenstein, Boca Raton, for appellee.
FARMER, Judge.
The issue from this appeal is whether a trial judge can preclude the custodial parent of one religious faith from actively influencing the training of the child inconsistently with the different religious faith of the other parent, and require the custodial parent to raise the child in the other parent's faith and cooperate with the other parent in effecting the result. We answer no.
This was a second marriage. When they met, the mother was Roman Catholic and the father of the Jewish faith. She already had two young children by her previous marriage, who resided with her and were being raised as Catholics. As the parties considered marrying, they had extended discussions about religion. Ultimately she agreed to convert to Judaism after he insisted that they would not marry unless she did so.[1]
Their daughter was born nearly a year after the marriage. Shortly after her birth, the mother converted back to Catholicism. When the daughter was 4 1/2 years old, they decided to divorce. The principal dispute at trial was the child's religion. The trial court framed the issue as whether the:
"shared parental responsibilities of the parents * * * be dictated so as to require [the child] be raised in the Jewish tradition and not allow interference with the religious training and upbringing nor influence the child on any other religious matters."
The court recognized that the child would be raised in a home with two other children who were already being raised as Catholics, who would attend mass on Sunday, who were likely to attend parochial school or catechism classes, and who would likely participate in Catholic ceremonies such as First Holy Communion and Confirmation. At the same time, the court also recognized that there was no evidence that the child's best interests would be affected by any order the court might make on the subject of religious preference.
The court enforced the parties' agreement for shared parental custody and ordered that the mother be the primary, custodial parent. Ultimately, the court decided that she would be required to "do everything in her power to assure [the child] shall be raised in the Jewish faith and shall cooperate with [the father] in seeking this result." The court specified that the mother:
"should not interfere in the development of the child's Jewish religious training and upbringing, nor should she actively influence the religious training of the child in any other direction, other than the Jewish faith."
In an order on a motion for rehearing, the court further explained what it was requiring of the mother:
"The Petitioner should not interfere in the development of the child's Jewish religious training and upbringing, nor should she actively influence the religious training *1159 of the child in any other direction, other than the Jewish faith. * * * It will be her responsibility to weigh and consider all aspects of the child's upbringing, in light of her responsibility."
It is these orders that we review.
We begin by noting that the trial judge's injunction is not expressly founded on any fact relating to the physical or psychological welfare of the child. Rather it seems to flow from the court's finding that the mother had agreed before marriage to convert to the Jewish faith. Thus the restriction is not grounded in a factual finding that an attempt to expose the child to Catholic teachings or to raise the child as Catholic would adversely and detrimentally affect her well-being or welfare. Equally, it is not based on any finding that it would beneficially promote her health or welfare if she were raised in Judaism. It is thus safe to say that the court's order must find its support in something other than the traditional rubric "the best interests of the child." Lurking beneath the order, as we have already hinted, is the suggestion that an oral premarital agreement to convert to Judaism authorizes a judge to enjoin a parent to raise the child in that faith.
American society is frequently described as being diverse in religions. Many of the earliest settlements in the new world were designed as havens for dissenters from religious orthodoxy. Although one or more of the early colonies could accurately be described as theocracies, later settlers came from differing, often opposing, religious backgrounds. By the time of our revolutionary war, religious diversity was a fact of colonial life. Thus, it is no accident that the very first in our Bill of Rights protected the free exercise of religion and barred the government from establishing or supporting any particular religion.
The freedom to choose any religion necessarily comprehends the freedom to change religions. Great changes in religious beliefs by individuals are a feature of Western history; e.g., Saul of Tarsus on the road to Damascus; Constantine and the cross in the sky; Martin Luther and the cathedral door at Worms, to cite a few. We would reduce the right to the free exercise of religion by half if we did not recognize the right to change one's religious mind. At the same time, moreover, the momentous events of a life may bring one to question one's religious views, and the parental aspirations of women and men often evolve after the birth of a child.
We recognize that a person contemplating marriage may properly agree with a prospective spouse on many subjects. Certainly, the law will enforce any such bargain so long as it is not against public policy. We have grave doubts, however, that the law could or should enforce an unwritten premarriage agreement to raise a child in one faith or the other. These doubts are intensified when the parent to be compelled later suffers, as here, a genuine, good faith change of religious conscience.
Quite apart from the obvious human willingness to promise anything when one is in the throes of romantic passion and urgent to commit to marriage, we are concerned about the implications of judges using their contempt powers to preclude a custodial parent whose marriage is being dissolved from doing anything to influence the religious training of a child inconsistently with the faith of the other parent. In this case, the order is even more involved in the free exercise of religion in that it commands the custodial parent to do everything in her power to promote, as it were, a religious belief in the child that the parent is conscience stricken against.
There is no provision in our laws purporting to authorize such judicial enforcement in married parents. In a dissolution of marriage action, the court's powers as to matters relating to the custody of minor children are found in section 61.13(2) and (3), Florida Statutes (1993). When a court is required to decide an issue as to the custody or support of minor children, the sine qua non of the exercise of those powers is the best interests of the child. Subsection (3) contains a listing of factors affecting the welfare and interests of the child. There is absolutely nothing in the statutory listing that expressly makes the religious training of the child a factor that the court should consider. While the catch-all provision in subsection (3)(k), "[a]ny other *1160 fact considered by the court to be relevant," might reasonably be understood to include religion, we are unwilling to read such a personal belief of parents into the statute without more positive and express direction from the legislature.
We find support for our position in Rogers v. Rogers, 490 So.2d 1017 (Fla. 1st DCA 1986). There the mother was a member of a religious organization known as The Way International. At trial the experts battled over whether the influence of The Way had a detrimental effect on the mother's ability to properly raise her children. Her experts testified that there was no deleterious effect, while his testified to the contrary. She was awarded custody of the children, subject to the following restrictions:
"[T]he primary physical residence of the children shall be with * * * [the mother] * * * provided that * * * [the mother] severs all connections with the organization known as The Way International. This severance must include any meetings, tapes, visits, telephone or written communications, or financial support between the * * * [mother] and The Way International [sic].
This injunction shall also prohibit * * * [the mother] from subjecting the children of this marriage in any manner whatsoever to any of the dogmas of The Way International." [e.s.]
490 So.2d at 1018. On appeal the mother argued that the condition impermissibly interfered with her free exercise rights. The first district agreed and held that although a trial court may consider religion as a factor in a custody determination, it may not condition the award of custody upon the parent's curtailment of the parent's religious activities or beliefs.
The final judgment in Rogers ordered the mother to sever all ties with The Way, while the order here does not prohibit the mother, in so many words, from practicing her Catholicism. Yet she has been ordered not to influence the child's religious training contrary to Judaism. We wonder how the mother may freely exercise her religion and that of her other children with this child in her home, without "actively influencing" the child. The order here is thus indistinguishable from Rogers, which was reversed in spite of expert testimony that the mother's religious practices had a detrimental effect on her ability to raise her children. It seems clear to us that the Rogers court simply concluded that religious training of children is not an issue covered by section 61.13(2) and (3).
The third district's decision in Mendez v. Mendez, 527 So.2d 820 (Fla. 3d DCA 1987), cert. denied, 485 U.S. 942, 108 S.Ct. 1122, 99 L.Ed.2d 283 (1988), is not contrary to our position. In that case, the trial court made the Catholic father the primary residential parent of the minor child. The mother, who was a Jehovah's Witness, was given extensive visitation rights. There was testimony from experts, family, friends and a guardian ad litem addressing the effect on the child arising from the conflicting religious beliefs. On appeal the mother argued that the trial court gave the father custody instead of the mother simply because she was a practicing Jehovah's Witness.
A majority of the third district disagreed. They noted that the trial court had considered the conflicting evidence and had conscientiously "avoided any interference with the right of the noncustodial parent to practice her religion and avoided the imposition on her of an obligation to enforce the religious beliefs of the father." [e.s.] 527 So.2d at 820. Although the dissenting opinion in Mendez argued that the mother was denied custody simply because of her religion and that the order actually precluded her from exposing the child to anything inconsistent with the Catholic religion, that is not what the majority concluded.[2] We are unable to find conflict *1161 in a dissenting opinion.[3]
Section 61.13 commands parents to confer on all major decisions affecting the welfare of their child and to reach an agreement as to any required decision. When the matter involves the religious training and beliefs of the child, we do not agree that the court may make a decision in favor of a specific religion over the objection of the other parent. Sotnick v. Sotnick, 650 So.2d 157 (Fla. 3d DCA 1995). As with married parents who share diverse religious beliefs, the question of a child's religion must be left to the parents even if they clash. A child's religion is no proper business of judges.
We also reverse that portion of the final judgment suspending the father's obligation to pay child support during any of the child's extended visits with him. In all other respects, we affirm.
SHAHOOD, J., concurs.
GLICKSTEIN, J., concurs specially with opinion.
GLICKSTEIN, Judge, concurring specially.
At the recent annual meeting of the Society for Values in Higher Education, Diana Eck, Professor of Comparative Religion and Indian Studies at Harvard University and Director of the Pluralism Project, described the remarkable religious diversity of United States citizens and our need for dialogue with citizens of other faiths. She made the salient point that understanding was substantially different than mere toleration.[4]
What we can hope for in this case is that with a Catholic mother and a Jewish father, their child will grow up with the understanding of self and others about which Professor Eck spoke. As Oscar Hammerstein II wrote in his timeless lyric: "You have to be taught to hate and fear."
NOTES
[1] The trial judge described her conversion as being with "great reservations ... because she had a great spiritual attachment to the Catholic faith, after a life-long training and association with the beliefs and traditions of Catholicism."
[2] The exact wording of the final judgment was set out in Judge Baskin's later dissent from the denial of the motion for rehearing en banc:

"The Wife shall not expose or permit any other person to expose the minor child to any religious practices, attendances, teachings or events which are in any way inconsistent with the religious teachings and practices of the Catholic religion. Nor shall the Wife preclude the child from engaging in any activity which is permitted by the Catholic religion."
527 So.2d at 823.
[3] In any event, it is highly doubtful that the third district disagrees with the position we take today. In Sotnick v. Sotnick, 650 So.2d 157 (Fla. 3d DCA 1995), the court affirmed a provision in a final judgment which refused to require that the child be raised in the Jewish faith in accordance with a written declaration of the parties during their marriage. The Sotnick opinion does not mention Mendez.
[4] In a different framework, Thomas L. Friedman recently observed: "Diversity without a spirit of community leads to tribalism. Community without a spirit of diversity leads to alienation for all minorities." Thomas L. Friedman, OP-ED, N.Y. Times, September 10, 1995, § 4, at 17.