Filed 1/19/22  Bixler v. Superior Court CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| CHRISSIE CARNELL BIXLER, et al., | B310559 |
| Petitioners, | (Los Angeles County Super. Ct. No. 19STCV29458) |
| v. | |
| SUPERIOR COURT FOR THE STATE OF CALIFORNIA, COUNTY OF LOS ANGELES, | |
| Respondent; | |
| CHURCH OF SCIENTOLOGY INTERNATIONAL, et al., | |
| Real Parties in Interest. | |

ORIGINAL PROCEEDING; petition for writ of mandate. Steven J. Kleifield, Judge.  Petition granted; remanded with directions.

Thompson Law Offices, Robert W. Thompson and Marci A. Hamilton for Petitioners.

Leslie C. Griffin, University of Nevada, Las Vegas, William S. Boyd School of Law, for Law and Religion Professors as Amici Curiae for Petitioners.

No appearance for Respondent.

Winston & Strawn, William H. Forman, David C. Scheper and Margaret E. Dayton for Real Parties in Interest Church of Scientology International and Church of Scientology Celebrity Centre International.

Jeffer Mangels Butler & Mitchell, Robert E. Mangels and Matthew D. Hinks for Real Party in Interest Religious Technology Center.

Lavely & Singer, Andrew B. Brettler and Martin F. Hirshland for Real Party in Interest Daniel Masterson.

———————————————

Petitioners in this writ proceeding are former members of the Church of Scientology who reported to the police that another Church member had raped them. They allege that, in retaliation for their reports, the Church encouraged its members to engage in a vicious campaign of harassment against them. After petitioners brought suit in superior court against the Church and related entities and persons, some of those defendants moved to compel arbitration, relying on agreements that provided all disputes with the Church would be resolved according to the Church's own "Ethics, Justice and Binding Religious Arbitration system." That system was created to decide matters "in accordance with Scientology principles of justice and fairness."

2

The trial court granted the motion to compel, and petitioners sought writ relief. We issued an order to show cause, and now grant the petition. Individuals have a First Amendment right to leave a religion. We hold that once petitioners had terminated their affiliation with the Church, they were not bound to its dispute resolution procedures to resolve the claims at issue here, which are based on alleged tortious conduct occurring after their separation from the Church and do not implicate resolution of ecclesiastical issues. We issue a writ directing the trial court to vacate its order compelling arbitration and instead to deny the motion.

*FACTUAL AND PROCEDURAL BACKGROUND*

**1.** *Allegations of the Operative Complaint*

The operative complaint is the first amended complaint. Plaintiffs are Chrissie Carnell Bixler, her husband Cedric Bixler-Zavala, Jane Doe #1, Jane Doe #2, and Marie Riales. Riales was not a member of the Church, was not subject to the order compelling arbitration, and is not party to the current writ proceeding. As such, we use "petitioners" to refer to all plaintiffs except Riales.

The defendants are Church of Scientology International, Religious Technology Center, Church of Scientology Celebrity Centre International, Daniel Masterson and David Miscavige.[1] Plaintiffs allege that Church of Scientology International and

---

[1] Miscavige was alleged to be the Chairman of the Board of one of the institutional defendants and the de facto leader of them all. He was not served in this action, did not move to compel arbitration, and is not a real party in interest to this writ proceeding. We do not discuss him further.

3

Religious Technology Center "along with a network of Scientology organizations that sit underneath [them], including [Celebrity Centre International], make up what is informally known to the public as 'The Church of Scientology' or 'Scientology.'" We collectively refer to the institutional defendants as "Scientology" or "the Church." Defendant Masterson is an individual member of the Church. Plaintiffs allege both that Masterson was an agent of the Church, and that the Church was an agent of Masterson.[2] The Church and Masterson are real parties in interest in this writ proceeding.

Plaintiffs Bixler, Jane Doe #1, Jane Doe #2, and Riales each allege that Masterson raped them. This, however, is not the gravamen of their complaint in this case; in fact, they state no cause of action against Masterson for sexual assault.[3] Instead, they allege causes of action against all defendants for stalking

---

[2] Masterson did not move to compel arbitration. At a case management conference after the trial court compelled petitioners to arbitrate their claims against Scientology, Masterson's counsel represented that he had "verbally in court" joined Scientology's motion to compel. The reporter's transcripts in our record do not reflect this. In any event, the trial court ruled he may "participate" in the arbitration. He joins Scientology's briefing in connection with this writ petition, and our disposition applies equally to him.

[3] At one point in their trial court briefing, plaintiffs argued that the "underlying substance of the claims" was "rape and harassment in retaliation for reporting rape." A later filing explained, "Although the claims are not *for* sexual assault, the facts and events surrounding the assaults give rise to each of Plaintiffs' causes of action."

4

(Civ. Code, § 1708.7), physical invasion of privacy (§ 1708.8, subd. (a)), constructive invasion of privacy (*id.*, at subd. (b)), intentional infliction of emotional distress, and (as to plaintiff Bixler-Zavala) loss of consortium. We summarize the allegations supporting these causes of action:[4]

According to plaintiffs, Scientology forbids members from contacting police to report a crime committed by a member. It instructs members that reporting such incidents is considered a "high crime" and subjects the reporting member to punishment. Scientology utilizes so-called "Fair Game" tactics to "attack, harass, embarrass, humiliate, destroy, and/or injure individuals who Defendants declare to be an enemy of Scientology, known in Scientology as a 'Suppressive Person' . . . ." Masterson is a television actor; Scientology granted him special treatment when he achieved "celebrity status." To that end, Scientology worked to prevent plaintiffs from reporting Masterson's crimes and, once they did, declared plaintiffs Suppressive Persons. Scientology then mobilized an aggressive Fair Game campaign against them.

While the Fair Game campaigns against each plaintiff differed, collectively plaintiffs allege Scientology's agents committed the following acts against them: surveilled them, hacked their security systems, filmed them, chased them, hacked their email, killed (and attempted to kill) their pets, tapped their phones, incited others to harass them, threatened to kill them, broke their locks, broke into their cars, ran them off the road, posted fake ads purporting to be from them soliciting anal sex from strangers, broke their windows, set the outside of their home on fire, went through their trash, and poisoned trees

---

[4]     We emphasize that these are the allegations of the complaint; Scientology denies their truth.

in their yards.  This conduct was alleged to be pursuant to Scientology's policies and procedures.  According to plaintiffs' complaint, Scientology's directives are that Suppressive Persons are to be silenced by whatever means necessary.  Scientology instructs members "to damage the person's professional reputation, file frivolous lawsuits, and harass and surveil 'the enemy.' "  Scientology's "policies and procedures encourage and/or instruct followers to 'ruin [the individual] utterly.' "

It will become relevant to our analysis whether the claimed tortious conduct on which petitioners sue took place before or after they left Scientology.[5]  While petitioners have clearly represented they are not seeking to recover from Scientology for the sexual assaults themselves, the allegations of petitioners' complaint include allegations relating to Scientology's attempts to cover up the sexual assaults while petitioners were still members.  These include, for example, Jane Doe #1's allegation that, when she reported that Masterson had raped her to her Scientology ethics officer, he required her to do an ethics program which pressured her into confessing the "evil purposes" she had toward Masterson and Scientology.  Jane Doe #1 alleged that, while she was still a member, she was given a formal censure within the church, called a "non-enturbulation order."  Similarly, Bixler alleged that, while she was still a member, Scientology forced her to sign a document stating she would

---

[5]      One petitioner, Bixler-Zavala, claims he never joined the Church at all, but simply obtained services from the Church on a few occasions.  Plaintiff Riales, it is to be remembered, was never a member, and is not a petitioner here.

never speak publicly about her relationship with Masterson or sue him for any reason.

In addition to events occurring while still a Scientology member, each petitioner alleged an invasive Fair Game campaign occurring entirely after she had left the church.[6] Bixler alleged that she formally terminated her relationship with the Church in October 2016, then reported Masterson to the police. It was only after her report that she was declared a Suppressive Person and she and her husband were subjected to the Fair Game campaign. Jane Doe #1 learned in June 2005 that she had been declared a Suppressive Person and was no longer permitted to engage in religious services at the Church. More than a decade later (after she asked the LAPD to reopen its investigation into Masterson), the Church commenced its Fair Game campaign against her. Jane Doe #2 ceased practicing Scientology entirely in 2004. In 2017, she reported Masterson's assault to the LAPD, at which point the Fair Game harassment began.

As to whether the conduct that occurred while petitioners were still Church members was actionable, or merely background, the complaint was not entirely clear. Plaintiffs included conspiracy allegations, which alleged Scientology "engaged in wrongful conduct, including but not limited to information suppression, coercion, deception, stalking, harassment, surveillance, threats, vandalism, theft, and/or fraud." "Information suppression" and "coercion" could include

---

[6] Again, Bixler's husband, Bixler-Zavala, asserts he never joined the Church. Bixler and Bixler-Zavala claim they were targeted by a single "Fair Game" campaign after Bixler left the Church.

7

the pre-Fair Game (and pre-separation) attempts to force petitioners to be silent about the rapes. However, when it came time to allege the facts supporting each individual cause of action, plaintiffs' focus was limited to the Fair Game campaigns themselves. For example, the cause of action for intentional infliction of emotional distress: Although the cause of action incorporates the earlier foundational facts, it does not allege that any wrong took place prior to separation. Instead, the cause of action alleges, "Defendants surveilled, harassed, stalked, and photographed Plaintiffs. Specifically, Defendants trespassed on Plaintiffs' personal property, looked in windows, followed and stalked, hacked personal online accounts and emails, engaged in surveillance of and interference with Plaintiffs' daily lives, and/or called, and/or texted, and/or otherwise attempted to communicate repeatedly." In sum, it appears that the vast bulk of the operative allegations related to facts occurring after the petitioners left Scientology. As we shall discuss, the trial court attempted to obtain clarity from plaintiffs' counsel as to whether the complaint sought relief for any pre-separation conduct by the Church.

## 2. *The Arbitration Agreements*

Before we turn to the motions to compel arbitration, we set out the language of the agreements on which Scientology relied to support its motion.[7] Specifically, defendants represented that all

---

[7] Petitioners did not recall signing the documents, and represented that they often signed documents that Scientology had directed them to sign without reading them first. Their writ petition is not based on an argument that they did not sign the agreements or that they did so under duress. We therefore

8

petitioners had signed agreements containing arbitration clauses in connection with their receipt of specific Scientology services and/or their enrollment in Scientology in general.[8]

Petitioners Bixler, Bixler-Zavala and Jane Doe #1 executed the same version of the Religious Services Enrollment Application, Agreement and General Release.[9]  It provides, in pertinent part:

"This Contract memorializes my freely given consent to be bound exclusively by the discipline, faith, internal organization, and ecclesiastical rule, custom, and law of the Scientology religion . . . in all my dealings of any nature with the Church, and in all my dealings of any nature with any other Scientology church or organization which espouses, presents, propagates or

assume, for purposes of this writ proceeding, that the documents were freely executed.

[8]     As we shall discuss, the agreements provided for dispute resolution of "any dispute, claim or controversy with the Church" as well as disputes arising from the specific service or services identified in the agreements.  If the dispute resolution clauses apply, they apply because of the "any dispute" language, not because the dispute in this case arose out of any particular religious services provided pursuant to the agreements.  As such, we omit reference to the portions of the dispute resolution clauses that relate to disputes arising from specific services.

[9]     Petitioner Bixler executed at least seven of these agreements from 2002 through 2012.  Her husband, Bixler-Zavala, signed his agreement on November 26, 2012.  Jane Doe #1 signed an agreement with the same language on February 25, 2002.

practices the Scientology religion.  By signing this Contract, I recognize, acknowledge and agree that:

　　"a.  My freely given consent to be bound exclusively by the discipline, faith, internal organization, and ecclesiastical rule, custom, and law of the Scientology religion . . . in all my dealings of any nature with the Church, and in all my dealings of any nature with any other Scientology church or organization which espouses, presents, propagates or practices the Scientology religion means that I am forever abandoning, surrendering, waiving, and relinquishing my right to sue, or otherwise seek legal recourse with respect to any dispute, claim or controversy against the Church, all other Scientology churches, all other organizations which espouse, present, propagate or practice the Scientology religion, and all persons employed by any such entity both in their personal and any official or representational capacities, regardless of the nature of the dispute, claim or controversy.

　　"b.  The abandonment, surrender, waiver, and relinquishment to which I refer in the immediately preceding subparagraph is unconditional and irrevocable and applies equally to anyone acting or purporting to be acting on my behalf or for my benefit, whether I am alive or dead, whether I am disabled or incapacitated, and under any and all circumstances foreseen or unforeseen, in perpetuity, without exception or limitation.

　　"c.  Should I or anyone acting or purporting to be acting on my behalf ever sue, or otherwise seek legal recourse with respect to any dispute, claim or controversy against the Church, any other Scientology church, any other organization which espouses, presents, propagates or practices the Scientology

10

religion, or any person employed by any such entity, regardless of the nature of the dispute, claim or controversy, I intend for the submission of this Contract to the presiding judicial officer to be a complete and sufficient basis for the immediate dismissal of any and all such proceedings with prejudice to further proceedings of any kind.

"d. In accordance with the discipline, faith, internal organization, and ecclesiastical rule, custom, and law of the Scientology religion, and in accordance with the constitutional prohibitions which forbid governmental interference with religious services or dispute resolution procedures, should any dispute, claim or controversy arise between me and the Church, any other Scientology church, any other organization which espouses, presents, propagates or practices the Scientology religion, or any person employed by any such entity, which cannot be resolved informally by direct communication, I will pursue resolution of that dispute, claim or controversy solely and exclusively through Scientology's Internal Ethics, Justice, and binding religious arbitration procedures, which include application to senior ecclesiastical bodies, including, as necessary, final submission of the dispute to the International Justice Chief of the Mother Church of the Scientology religion, Church of Scientology International ('IJC') or his or her designee.

"e. Any dispute, claim or controversy which still remains unresolved after review by the IJC shall be submitted to binding religious arbitration in accordance with the arbitration procedures of Church of Scientology International, which provide that:

"i.  I will submit a request for arbitration to the IJC and to the person or entity with whom I have the dispute, claim or controversy;

"ii.  in my request for arbitration, I will designate one arbitrator to hear and resolve the matter;

"iii.  within fifteen (15) days after receiving my request for arbitration, the person or entity with whom I have the dispute, claim or controversy will designate an arbitrator to hear and resolve the matter.  If the person or entity with whom I have the dispute, claim or controversy does not designate an arbitrator within that fifteen (15) day period, then the IJC will designate the second arbitrator;

"iv. the two arbitrators so designated will select a third arbitrator within fifteen (15) days after the designation of the second arbitrator.  If the arbitrators are unable to designate a third arbitrator within the fifteen (15) day period, then the IJC will choose the third arbitrator;

"v. consistent with my intention that the arbitration be conducted in accordance with Scientology principles, and consistent with the ecclesiastical nature of the procedures and the dispute, claim or controversy to which those procedures relate, it is my specific intention that all such arbitrators be Scientologists in good standing with the Mother Church."

The fourth petitioner, Jane Doe #2 signed an earlier version of the agreement several times between 1997 and 2001. Pursuant to that agreement, in exchange for being permitted to participate in specific religious services, Jane Doe #2 agreed, in part, as follows:

"I understand and acknowledge that because of constitutional prohibitions which forbid governmental

12

interference with religious services or dispute resolution procedures, that in the event I have any dispute, claim or controversy with the Church . . . which cannot be resolved informally by direct communication, resolution of the dispute, claim or controversy may be pursued solely through the internal procedures of the Church's Ethics, Justice and Binding Religious Arbitration system. . . .  I understand and acknowledge that the Church's religious dispute resolution procedure includes application to senior ecclesiastical bodies, including, as necessary, final submission of the dispute to the International Justice Chief of the Mother Church – Church of Scientology International – ('IJC') or his designate.

"Any dispute, claim or controversy which still remains unresolved after submission to the IJC shall be submitted to Binding Religious Arbitration in accordance with the published arbitration procedures of the Church of Scientology International, which provide [similar procedures for selecting the three-arbitrator panel].  Consistent with the intent that the arbitration be conducted in accordance with Scientology principles of justice and fairness, and consistent with the ecclesiastical nature of the procedures and the dispute, claim or controversy to which such procedures relate, all arbitrators shall be Scientologists in good standing with the Mother Church."[10]

---

[10]    A final paragraph, in all capital letters, states:  "IN ACCORDANCE WITH THE RELIGIOUS NATURE OF THE SERVICES TO BE PROVIDED, I ACKNOWLEDGE, UNDERSTAND AND AGREE THAT IN NO EVENT SHALL ANY DISPUTE, CLAIM OR CONTROVERSY ARISING OUT OF MY PARTICIPATION IN THE SERVICE BE SUBMITTED TO A COURT FOR JUDICIAL DETERMINATION.  MOREOVER, I

### 3.    *Scientology's Motions to Compel Arbitration*

The Church moved to compel arbitration pursuant to Code of Civil Procedure section 1281.2.[11]  However, Scientology argued that the religious nature of the arbitration exempted it from certain standards which would apply to routine civil arbitrations.  The Church argued that its arbitration agreements with petitioners were enforceable under either the California Arbitration Act or the Federal Arbitration Act.  "More importantly," the Church argued, "under the Free Exercise and Establishment Clauses of the United States and California Constitutions the Church may establish its own rules governing its relationship with its members exempt from civil law.  The

UNDERSTAND AND AGREE THAT BY SIGNING AND SUBMITTING THIS APPLICATION/AGREEMENT, I AM WAIVING ANY RIGHT WHICH I MAY HAVE TO HAVE SUCH DISPUTES, CLAIMS OR CONTROVERSIES DECIDED IN A COURT OF LAW, BEFORE A JUDGE OR A JUDGE AND JURY."  By the express language of this paragraph, it applies only to disputes, claims or controversies "arising out of my participation in the service."  This clause, unlike the earlier dispute resolution clause, does not appear to extend to "any dispute, claim or controversy" with the Church.

[11]    The record submitted in connection with this writ petition includes four operative motions to compel arbitration.  Specifically, one defendant (Religious Technology Center) filed its own motions, while the other Scientology defendants (Church for Scientology International and Celebrity Centre International) filed jointly.  In turn, both groups filed separate motions as to Jane Doe #2 and the other petitioners.  As the Scientology defendants joined in each other's motions, we consolidate their arguments in our discussion.

14

Church's ecclesiastical arbitration is a condition of participating in Scientology services. This Court may not interfere with this condition by imposing civil rules for arbitration."[12] "The only permissible inquiry is what [petitioners] and the Church agreed to. This Court may not impose its own notions of 'fairness' in deciding whether [petitioners'] agreements with the Church are fair or right. To do so would interfere with a Church's rules over its members, which is clearly forbidden by *Serbian E[.] Orthodox* [*Diocese v. Milivojevich* (1976) 429 U.S. 696]."[13]

The Church supported its motion with the declaration of Lynn Farny, one of its corporate officers and ordained ministers, who explained the Scientology Ethics and Justice system, and the level to which it was intertwined with the Scientology religion. Farny declared, "The justice codes and procedures are an inherent part of the religion, and are derived from our core beliefs." Farny set forth, in some detail, the ways in which

---

[12] The Church explained, "The United States and California Constitutions prohibit this Court from imposing civil concepts of due process when adjudicating disputes between a church and its members. Rather, a church's procedures for addressing such disputes is all but unreviewable."

[13] As we later discuss, in *Serbian E. Orthodox Diocese v. Milivojevich, supra,* 426 U.S. at page 710, the Supreme Court held that, whenever " 'questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them.' [Citation.]"

Scientology's beliefs are interwoven with its justice principles.[14] Scientology justice "contains exact procedures for resolving matters ranging from Chaplain's Courts (to resolve matters of dispute between individuals) to a fact-finding body addressing all other disputes (called a Committee of Evidence)." Scientology jurisprudence "is required [to] be used in all matters relating to Scientology organizations, groups and concerns." Farny stated, "The decisions, findings, judgments or other determinations made in a Scientology justice proceeding reflect fundamental religious beliefs, such as the 'greatest good for the greatest number of dynamics.' Therefore, it is a matter of Scientology doctrine that only specially qualified members of the Church, who are well-versed in Scientology policy, can adjudicate disputes concerning the proper interpretation and application of its religious laws."[15]

---

[14] In brief, Farny explained that Scientologists believe the "urge to survive" is the primary motivation of life; this is called the "dynamic principle of existence." This principle, in turn, is broken down into eight different dynamics, including, for example, self-survival, group survival, and species survival. "In Scientology, the concepts of good and evil/right and wrong are defined in terms of the eight dynamics, and, indeed, can only be understood in the context of these dynamics: Acts are good which are more beneficial than destructive along these dynamics. Evil is the opposite of good, and is anything which is destructive more than it is constructive along any of the various dynamics."

[15] This last statement seems to refer only to the Church's internal dispute resolution procedures prior to arbitration, not the arbitration itself, which requires only that the arbitrators be Scientologists in good standing.

## 4. *Criminal Proceedings Against Masterson*

Between the time Scientology's motions to compel and petitioners' opposition were filed, criminal proceedings were commenced against Masterson. He was charged with three counts of forcible rape, against victims Bixler, Jane Doe #1, and Jane Doe #2, (Pen. Code, § 261, subd. (a)(2)) and pleaded not guilty.[16]

## 5. *Petitioners' Opposition to the Motion to Compel*

Petitioners jointly opposed all of Scientology's motions to compel. Among a number of grounds for opposition, they argued that the dispute resolution procedure Scientology was attempting to compel was not an arbitration at all, but a religious ritual – a "form of religious punishment for nonbelievers who did not follow church doctrine."[17] This encompassed two subsidiary arguments. First, petitioners argued it was unconstitutional to force them to participate in such a ritual, as they have exercised their constitutional right to change religions. Petitioners supported their motion with

---

[16] The record does not reflect the current status of the criminal case.

[17] Petitioners relied on the declaration of Michael Rinder, a former member of the Church, who explained, in great detail, his belief that Scientology does not conduct traditional arbitrations, and would instead subject petitioners to a religious punishment procedure through a Committee of Evidence. Scientology's objections to the Rinder declaration were sustained in their entirety, and petitioners do not challenge this ruling in their writ petition. Petitioners have therefore forfeited any contentions of error regarding those evidentiary rulings. (*Fritelli, Inc. v. 350 North Canon Drive, LP* (2011) 202 Cal.App.4th 35, 41.)

17

declarations stating that the campaign of harassment occurred after they left the church. Second, they argued they would be unable to receive a fair adjudication because, as they had been declared Suppressive Persons, any arbitration panel comprised of "Scientologists in good standing" would be required, by the Fair Game doctrine, to rule against them, or risk being declared Suppressive Persons themselves.

## 6.    *Scientology's Reply*

In reply, Scientology took the position that its dispute resolution proceedings were not religious rituals. Scientology argued that its dispute resolution procedures were to be governed by Scientology law, claiming, the "[a]greement to be bound by Scientology law, including Scientology dispute resolution procedures and arbitration, is a condition for acceptance into Scientology religion."

The Church argued, "Plaintiffs ask this Court to adopt a radical position never embraced by any court in the United States: Agreements to submit disputes to religious arbitration are null and void when one of the signatories later decides to leave the religion. The entire thrust of the Opposition is that an apostate – a person who has left a religion – may not be 'forced' to participate in religious arbitration for fear of violating the First Amendment. This argument runs counter to every principle of contract law and arbitration law, and itself creates an impermissible and unconstitutional separate standard for adjudicating agreements entered into by churches."

The Church represented that petitioners had not, in fact, been declared Suppressive Persons, but argued that, in any event, this was a "dispute over orthodoxy" which should be "litigated 'exclusively' in an ecclesiastical setting. This court

may not adjudicate what is and is not Scientology doctrine, or whether Plaintiffs have been 'declared' by the Church under its doctrine, but that is what Plaintiffs seek."[18]

As part of its Reply, Scientology submitted an additional declaration of Lynn Farny. Farny declared that "Fair Game" is not a Church doctrine and that, in fact, "[i]n the authorized published works of the Church, comprising some 70 million printed and spoken words, the phrase 'Fair Game' *never* appears." Plaintiffs had relied on a 1967 Scientology document indicating that the penalty for an "ENEMY" was "SP Order. Fair game. May be deprived of property or injured by any means by any Scientologist without any discipline of the Scientologist. May be tricked, sued or lied to or destroyed." Farny represented that this document was canceled in 1968, and is no longer Church doctrine.

### 7.    *Sur-reply Raising Additional Issues*

In response to the reply, petitioners filed an unauthorized sur-reply, in which they raised new arguments against arbitration. Specifically, they had obtained a criminal protective order against Masterson, and argued that compelling arbitration would violate both the protective order and Marsy's Law (Cal. Const., art. I, § 28), in that the Scientology proceedings would enable Masterson to continue to harass them. They even envisioned a scenario in which Masterson, as a Scientologist in

---

[18]    We fail to see anything in the record indicating that petitioners sought a court ruling as to whether they had been declared Suppressive Persons or whether any such declaration was appropriate under Scientology doctrine. It was petitioners' view that they had brought suit, under California law, for torts allegedly committed against them, and sought resolution of their complaint in a judicial, as opposed to a religious, forum.

good standing, could be appointed one of the three arbitrators. Although the trial court did not consider the unauthorized sur-reply, it made a point of reviewing the protective order to ensure that it would not forbid arbitration.

8.   *Hearing*

On November 6, 2020, the court held a hearing on the motions to compel.  The court expressed concern that the acts underlying the complaint occurred after the petitioners' relationship with the Church had terminated.  Scientology argued that the complaint included allegations "that they were abused by the Church while they were at the Church, that the Church ignored their complaints about Mr. Masterson, but they covered up complaints about Mr. Masterson while they were at the Church.  And these are incorporated into all their claims, that these incorporate facts that go to their participation in the Church into their claims.  So there's that part of the scope."  The court asked petitioners' counsel if there was a legal distinction, for purposes of enforcing the arbitration agreement, between claims based on events that occurred after a former member left the church and claims based on events that happened while the former member was still a member.  Petitioners' counsel declined to specifically answer the question, taking the position that, since the Scientology arbitration itself would be a religious procedure, what mattered was that petitioners had left the Church prior to the proposed arbitration, not whether they had left prior to the alleged tortious conduct.

Scientology argued that the agreement to arbitrate survived termination of the agreement itself, stating, "this is a pledge for as long as you might have claims against the Church to arbitrate your issues against the Church."  In response,

20

petitioners again argued that the contemplated procedure was a religious ritual, and they had a First Amendment right to leave the Church and no longer be compelled to participate in that ritual.

### 9.    *Additional Briefing*

The court sought additional briefing and argument on the applicability of the Federal Arbitration Act.  The Church again argued that petitioners' claims had their genesis in their relationship to the Church and the Church's alleged cover-up (pursuant to Church doctrine) of the rapes.

Petitioners' December 9, 2020 opposition brief took the position – for the first time in unequivocal language – that the causes of action did not, in fact, rely on conduct arising before they left the Church:  "All claims alleged by Plaintiffs occurred after Plaintiffs left Scientology and therefore do not arise from the agreements which covered Plaintiffs' religious services when they were members."

### 10.   *Ruling*

The court issued its ruling on December 30, 2020.  The court agreed with petitioners' limited view of their complaint, stating, "Defendants state that Plaintiffs' claims against them as entities are that they were subject to mistreatment pursuant to official Church doctrine after they filed police reports; contentions that they could have prevented the violence against them committed by Masterson; and allegations of traumatic experiences while they were part of the Church.  [Citations.]  [¶] The causes of action begin at paragraph 262 of the complaint and incorporate all preceding paragraphs.  However, the charging allegations of the causes of action themselves are

21

limited to the alleged harassment Plaintiffs experienced after they came forward regarding the alleged sexual violence."

Turning to the merits, the court rejected petitioners' argument that compelling arbitration would force petitioners to engage in a religious ritual, on the basis that they had submitted no admissible evidence to prove it was a ritual. To the extent the arbitration may have a religious component, petitioners voluntarily agreed to it.

The court determined that, under the agreements, the issue of arbitrability was for the court to determine. Although the court agreed with petitioners that their complaint was limited to post-separation conduct, the court concluded the conduct was nonetheless arbitrable. The court reasoned that the plain words of the agreements encompassed all claims against Scientology and not merely those arising from the contracts.

The court declined to address petitioners' challenges to the fairness of the procedure, stating, "whether the rules of Scientology are fair as applied to Plaintiffs would require the Court to delve into the doctrines of Scientology. The First Amendment Free Exercise Clause prevents the court from engaging in that inquiry." The court concluded this would be an inquiry of faith, which must be left to adjudication of the Church itself, under the doctrine of religious abstention.

11. *Writ Proceedings*

Petitioners filed a petition for writ of mandate. On March 9, 2021, in a divided opinion, we denied the petition on the basis that petitioners had an adequate remedy by way of appeal if the court entered an order confirming an adverse arbitration award. On May 26, 2021, the Supreme Court granted review and transferred the matter back to this court

22

with directions to vacate the denial and issue an order to show cause. We did so. The case has been fully briefed and argued, and we now issue the writ.[19]

## DISCUSSION

This case involves both petitioners' First Amendment rights to leave a faith and Scientology's right to resolve disputes with its members without court intervention. When applied to a dispute that arose after petitioners left the faith, and which can be resolved on neutral principles of tort law, we find petitioners' right to leave the faith must control.

We first discuss the constitutional right to leave a faith; then we turn to the potential applicability of the religious abstention doctrine.

---

[19] On the day of oral argument on these writ proceedings, the Eleventh Circuit issued its opinion in *Garcia v. Church of Scientology Flag Service Organization, Inc.* (11th Cir. 2021) 2021 WL 5074465. In that case, former members of the Church (the Garcias) had sued for a refund of money they had donated to the church while members. The district court compelled arbitration over the Garcias' assertion of unconscionability, and, following arbitration, denied their motion to vacate. On the Garcias' appeal, the Eleventh Circuit affirmed. In its opinion, the court described the Garcias' arbitration as the first in the history of Scientology. (*Id.* at p. *3.) The Church brought the Eleventh Circuit's *Garcia* opinion to our attention, as it affirmed orders compelling and confirming what may have been the only Scientology arbitration to occur to date. While we find *Garcia* relevant to Scientology's constitutional argument, and discuss it in that context, we recognize that the Garcias had sought the return of funds donated while they were members. The case therefore did not consider whether former members could be compelled to arbitrate claims arising from torts committed after they had left the church.

23

### 1. *Standard of Review*

The party seeking to compel arbitration has the burden of proving the existence of an enforceable arbitration agreement by a preponderance of the evidence, and the party opposing the petition bears the burden of proving by a preponderance any fact necessary to its defense. (*Caballero v. Premier Care Simi Valley LLC* (2021) 69 Cal.App.5th 512, 517.) When the evidence is not in conflict, we review the court's ruling on a petition to compel arbitration de novo. (*Banc of California, National Assn. v. Superior Court* (2021) 69 Cal.App.5th 357, 367.) Here, although certain facts may be contested, the core facts necessary to resolve the issues before us are not disputed. Accordingly we employ the de novo standard of review.

### 2. *The Constitutional Right to Leave a Faith*

We begin by considering the constitutional implications of a member's decision to leave a faith. An individual possesses an "*inalienable* First Amendment right to the free exercise of religion, which includes her right to change her religious beliefs . . . ." (*In re Marriage of Weiss* (1996) 42 Cal.App.4th 106, 118.) "The constitutional freedom to question, to doubt, and to change one's convictions, protected by the Free Exercise and Establishment Clauses, is important for very pragmatic reasons. For most people, religious development is a lifelong dynamic process even when they continue to adhere to the same religion, denomination, or sect." (*Zummo v. Zummo* (Pa. Super. 1990) 574 A.2d 1130, 1146.) "The First Amendment specifically preserves the essential religious freedom for individuals to grow, to shape, and to amend this important aspect of their lives, and the lives of their children. Religious freedom was recognized by our founding fathers to be inalienable. It remains so today." (*Id.*

at p. 1148, italics omitted.) "One of the fundamental purposes of the First Amendment is to protect the people's right to worship as they choose. Implicit in the right to choose freely one's own form of worship is the right of unhindered and unimpeded withdrawal from the chosen form of worship." (*Guinn v. Church of Christ of Collinsville* (Okla. 1989) 775 P.2d 766, 777, fn. omitted (*Guinn*) [concluding plaintiff had a right to leave her church even when the church took the position withdrawal was doctrinally impossible].)

California precedent counsels against enforcing agreements that would violate an individual's right to change religions. The issue arose in *In re Marriage of Weiss, supra,* 42 Cal.App.4th 106. There, prior to marrying her Jewish husband, a woman converted to Judaism and executed a written "Declaration of Faith," in which she pledged to rear all their children " 'in loyalty to the Jewish faith and its practices.' " (*Id.* at p. 109.) After the couple divorced, the woman returned to Christianity. (*Ibid.*) She was attending church and had enrolled the couple's child in Sunday school. The child also attended a weekly club meeting at the church and had attended church summer camp. The father "acknowledged [the mother] had the right to expose the minor to her religion, but objected to the minor's being indoctrinated in the Christian faith or being enrolled in any activity 'that would be contrary to his Jewish faith.' " (*Id.* at p. 110.)

The trial court refused to restrain the mother's religious activity with the child. The father appealed, arguing the court erred in not enjoining the mother from engaging the child in Christian religious activity. (*In re Marriage of Weiss, supra,* 42 Cal.App.4th at p. 110.) The Court of Appeal affirmed,

recognizing the rule in California that a parent cannot enjoin the other parent from involving their child in religious activities in the absence of a showing of harm to the child. (*Id.* at p. 112.) The father argued that the written antenuptial agreement should be enforced as an exception to that rule and that the mother should be bound by her promise. (*Id.* at p. 117.) Relying heavily on the analysis of the Pennsylvania appellate court in *Zummo v. Zummo, supra,* 574 A.2d 1130, the *Weiss* court disagreed. (*Weiss,* at pp. 117-118.) The court concluded the agreement was legally unenforceable for two reasons: enforcement would result in improper judicial entanglement in religious matters and would violate the mother's First Amendment right to change her religion. (*Id.* at 118.) As Presiding Justice Klein wrote, "Further, in view of [the mother's] *inalienable* First Amendment right to the free exercise of religion, which includes the right to change her religious beliefs and to share those beliefs with her offspring, her antenuptial commitment to raise her children in [the father's] faith is not legally enforceable for that reason as well." (*Ibid.*) While a parent's religious freedom may yield to other competing interests, " 'it may not be bargained away.' [Citation.]" (*Ibid.*)

We pause to point out that, in the briefs filed both in the trial court and this court, petitioners spend considerable time on whether Scientology arbitration constitutes a religious ritual, such that compelling their participation in the ritual would violate their First Amendment rights for that reason. Whether Scientology arbitration is a ritual is immaterial to our analysis. The issue properly phrased is: after petitioners have left the faith, can Scientology still require that all of Scientology's future

26

conduct with respect to petitioners – including torts of whatever kind – be governed by Scientology law, with disputes to be resolved solely in Scientology tribunals by Scientology members? We conclude it cannot. Just like written antenuptial agreements to raise children in a particular faith are not enforceable against a parent who has left the faith, Scientology's written arbitration agreements are not enforceable against members who have left the faith, with respect to claims for subsequent non-religious, tortious acts. To hold otherwise would bind members irrevocably to a faith they have the constitutional right to leave.[20]

---

[20]     Relying on cases which do not involve compelling a party to participate in religious arbitration, Scientology argues that judicial enforcement of a contract does not constitute state action; therefore, enforcement of the arbitration agreements could not violate petitioners' free exercise rights. (E.g. *Rifkind & Sterling, Inc. v. Rifkind* (1994) 28 Cal.App.4th 1282, 1292-1293 [only a limited degree of state action is involved in confirming an arbitration award; it does not require a full panoply of due process rights]; *Roberts v. AT&T Mobility LLC* (9th Cir. 2017) 877 F.3d 833, 838, fn. 1 [enforcing an arbitration agreement does not constitute state action violative of a signatory's First Amendment right of petition]; *Ohno v. Yasuma* (9th Cir. 2013) 723 F.3d 984, 987 [recognition and enforcement of a Japanese monetary judgment does not constitute state action triggering direct constitutional scrutiny of whether the judgment violates the judgment debtor's free exercise rights].) We believe cases such as *In re Marriage of Weiss, supra,* which specifically hold that a party cannot bargain away her constitutional right to change religions, are the appropriate precedent. In contrast to Scientology's theory that enforcing agreements which limit the right to change religions would not constitute state action, those

Our analysis takes a somewhat different path to the same result with respect to Jane Doe #1. Jane Doe #1 does not allege that she voluntarily left the Church; instead, she learned in 2005 that she had been declared a Suppressive Person and was told she was no longer permitted to engage in religious services at the Church. Having excluded Jane Doe #1 from its religious services, and allegedly committed torts against her more than 10 years later, the Church cannot now enforce against Jane Doe #1 the arbitration clause in an agreement she signed in order to obtain the religious services from which she has been excluded. If the religious relationship has been terminated – by either party – and the parishioner is no longer a member of the Church, the arbitration clause does not survive to cover disputes arising from future non-religious tortious conduct.

3. ***The Religious Abstention Doctrine Does Not Change the Analysis***

Scientology's motion described itself as a motion to compel "religious arbitration." That Scientology sought to compel an arbitration that was religious, rather than secular, in nature was a critical part of its motion. Scientology argued that because it was seeking to compel religious arbitration, the court could not review the proposed arbitration procedures for

---

authorities recognize that court enforcement of such an agreement would encroach on a person's fundamental constitutional right. (*Id.* at p. 118; *Zummo v. Zummo, supra,* 574 A.2d at p. 62. See also *Abbo v. Briskin* (Fla.Dist.Ct.App. 1995) 660 So.2d 1157, 1160 [the law will enforce premarital agreements on a number of topics, as long as they are not against public policy; the court has "grave doubts" that it could or should enforce an agreement to raise a child in a particular faith where the parent suffers a good faith change of religious conscience].)

"fairness." It argued that its right to govern its relations with its members was protected by the First Amendment, and rendered its procedures "all but unreviewable." This argument invokes the legal doctrine of religious abstention.

We do not purport to review the procedures of Scientology arbitration. We do find that a discussion of religious abstention as imposed on courts and the reasons for, and limitations of, this doctrine, supports our conclusion.

Religious (or ecclesiastical) abstention compels courts to abstain from resolving religious issues. Courts instead yield to the decision of the highest religious tribunal to address the issue. "In short, the First and Fourteenth Amendments permit hierarchical religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters. When this choice is exercised and ecclesiastical tribunals are created to decide disputes over the government and direction of subordinate bodies, the Constitution requires that civil courts accept their decisions as binding upon them." (*Serbian E. Orthodox Diocese v. Milivojevich, supra,* 426 U.S. at pp. 724-725.)

Religious abstention first arose in *Watson v. Jones* (1871) 80 U.S. 679, a case involving a Kentucky Presbyterian church whose members, in the years leading up the Civil War, split over the issue of slavery. The schism in the church membership led to a dispute over which side controlled the property owned by the church. The overarching institution, the Presbyterian Church of the United States, supported emancipation and therefore sided with the anti-slavery faction. (*Id.* at pp. 690-692.) When the dispute reached the U.S. Supreme Court, the

29

court yielded to the resolution of the mother church, saying, "In this class of cases we think the rule of action which should govern the civil courts, founded in a broad and sound view of the relations of church and state under our system of laws, and supported by a preponderating weight of judicial authority is, that, whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them." (*Id.* at p. 727.)

Over the years, the doctrine has been applied in additional cases involving disputes over church property (e.g. *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church* (1969) 393 U.S. 440, 449-450; *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church* (1952) 344 U.S. 94, 109) and disputes between a church and its ministers (e.g., *Serbian E. Orthodox Diocese v. Milivojevich, supra,* 426 U.S. at pp. 697-698.) In the latter setting, religious abstention manifests in the so-called "ministerial exception," which exempts religious organizations' decisions regarding the employment of ministers and teachers from employment discrimination laws. (*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC* (2012) 565 U.S. 171, 188 [ministerial exception barred EEOC and individual claims of discrimination under the American with Disabilities Act]; *Our Lady of Guadalupe Sch. v. Morrissey-Berru* (2020) ___ U.S. ___ [140 S. Ct. 2049, 2055, 2060] [extending ministerial exception to religious school teachers who are not ministers].)

30

Religious abstention does not control the result in this case for the reason that the doctrine is restricted to the adjudication of religious matters. Civil law must defer to a religious authority's resolution of ecclesiastical questions. If the matter does not concern "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them," there is no cause for abstention. (*Watson v. Jones, supra,* 80 U.S. at p. 733.)

This limitation was recognized in *Garcia v. Church of Scientology Flag Service Organization, Inc., supra,* 2021 WL 5074465, the Eleventh Circuit case confirming an arbitration award in what may have been the first Scientology arbitration held. There, a religious tribunal directed the Church to refund part of a donation former parishioners had made to the Church when they were members. The former members moved to vacate the award because they claimed the amount did not fully compensate them. The district court denied the motion to vacate and the Eleventh Circuit affirmed. In doing so, the court rejected Scientology's argument that *Milivojevich* and other religious abstention cases limited the court's review of the arbitration. "Those decisions make clear that civil courts may not disturb the decisions of ecclesiastical tribunals on matters of church discipline and governance, minister selection, and other matters of faith and doctrine. [Citations.] But the Garcias do not ask us to disturb an ecclesiastical tribunal's resolution of a dispute that is 'ecclesiastical in its character,' such as a dispute about 'theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them.' [Citation.] They

31

instead ask us to review a monetary award issued by an arbitration panel. Our review of that award poses no risk of intruding upon the authority of the Church of Scientology in matters of 'ecclesiastical cognizance.' [Citation.]" (*Id.* at p. *10.) The Eleventh Circuit also held religious abstention did not bar the court from reviewing whether the arbitrators exhibited partiality or committed misconduct. A civil court conducting such review uses neutral principles of law; it is not a question of religious doctrine. (*Id.* at p. *11.)

Similarly, in a case specifically involving imposition of discipline by a church on a former member, the Oklahoma Supreme Court held that religious abstention did not apply because the issue was whether the actions of church elders violated the plaintiff's right to be free from torts, not whether the discipline was appropriate under church doctrine. (*Guinn, supra,* 775 P.2d at p. 773 & fn. 25.)

Here, petitioners' lawsuit against Scientology is based on neutral principles. They are not alleging that the "Fair Game" campaign against them did not comport with Scientology law; they are alleging that the conduct the Church engaged in was tortious under California law. California courts can resolve this issue under neutral principles of law.[21] Similarly, the issue of

---

[21] In an apparent attempt to pursue vicarious liability for the harassment campaign allegedly waged against them, plaintiffs alleged that Fair Game was, in fact, part of Scientology's practices. Scientology, through the declaration of Farny, represented that it was not. We express no opinion on the merits of this particular dispute. But plaintiffs allege the Church is liable for the tortious acts because they were committed "by or at the direction of Defendants' employees, agents, and/or

32

arbitrability itself can be resolved under neutral principles of law – here, petitioners' constitutional right to change religions. The issue is not one of Scientology doctrine, but generally applicable principles of law.

Religious abstention has its roots in consent – specifically, an individual's voluntary membership in, or employment by, a church, or a local church's voluntary alignment with a mother church. In *Watson v. Jones, supra,* the court explained its rationale in this manner: "The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. *All who unite themselves to such a body do so with an implied consent to this government,* and are bound to submit to it." (*Watson v. Jones, supra,* 80 U.S. at pp. 728-729, emphasis added; *Serbian E. Orthodox Diocese v. Milivojevich, supra,* 426 U.S. at pp. 710-711 [quoting *Watson*].) Here, petitioners withdrew their consent when they left the faith. The notion of consent no longer exists as the necessary predicate for religious abstention.

---

representatives." They further allege that "each of the aforementioned Defendants lent aid and encouragement and knowingly financed, ratified, and/or adopted the acts of the other." These bases for vicarious liability can be resolved independent of any determination of Church doctrine.

33

**4.** *Denying Arbitration Does Not Evince Hostility to Religion*

In a related argument, Scientology contends that failing to enforce the arbitration clause in its agreements violates its Free Exercise rights, in that our conclusion shows hostility to religion. The argument continues that, because as a general principle, arbitration contracts may survive termination of the underlying contractual relationship, the same should be true for religious arbitration. We reject Scientology's premise; it has provided no authority upholding an arbitration agreement ad infinitum, and the California case on which Scientology relies for this proposition is distinguishable. In *Buckhorn v. St. Jude Heritage Medical Group* (2004) 121 Cal.App.4th 1401, a physician formerly employed by a medical group sued the medical group for wrongful termination and for torts allegedly committed after he was discharged. Specifically, he alleged that after he left, the medical group informed his patients that he had left the medical group for a variety of false reasons (e.g., marital or mental problems). He alleged causes of action for defamation, negligent interference with prospective business advantage, and unfair competition. (*Id.* at pp. 1404-1405.) When the medical group sought to compel arbitration, based on an arbitration clause in his employment agreement, the physician argued that the arbitration clause did not apply to the tortious conduct which occurred after he was terminated. The Fourth District Court of Appeal rejected this argument, on the basis that his tort claims "stem[med] from the contractual relationship between the parties," and were therefore within the scope of the arbitration agreement. (*Id.* at p. 1403.) Here, petitioners' claims against Scientology do not stem from the contractual relationship; they

34

stem from the alleged "Fair Game" campaign Scientology engaged in as retribution for reporting Masterson to police after they left the Church. This harassment allegedly arose because of petitioners' relationship with Masterson and their reporting his conduct to police, not because of their prior affiliation with Scientology. Indeed, plaintiff Riales alleged a similar Fair Game campaign of harassment, and it is undisputed she was never a member.

As we recognized at the outset, this case involves two free exercise rights: petitioners' right to leave a faith *and* Scientology's right to resolve disputes with its members without court intervention. Resolving this tension does not reflect hostility to religion.

**5.** *The Court Erred in Compelling Arbitration*

Scientology takes the position that petitioners agreed to its dispute resolution procedures as a condition of joining the Church (or, as to Bixler-Zavala, as a condition of receiving services from the Church). It argues that, even though petitioners have left the Church, they are still bound by the terms of their contracts.

We reject this argument. Much like the mother in *Weiss* who by written agreement covenanted to raise her child Jewish but then left the faith, petitioners have a constitutional right to disassociate from a religious community. Having exercised this right to disassociate, they are no longer members subject to the Church's religion and rules, which otherwise would bind them to Scientology dispute resolution for life.

We acknowledge that petitioners have not been entirely consistent about whether the alleged facts on which they base their causes of action were limited to those occurring after they

separated from the Church; they ultimately represented that such was the case, and the trial court found it to be so. In this court, petitioners first asserted that they "allege these acts occurred both while they were in the religion and after they exited the religion." But in response to our request for supplemental letter briefing, petitioners state that "their causes of action are based on conduct after they left the Church . . . ." Our decision is predicated on that final representation, and we construe petitioners' claims for relief as limited to conduct occurring after they left the faith. The alleged campaign of harassment which forms the basis of petitioners' lawsuit occurred after petitioners had left Scientology and expressly or impliedly had withdrawn their consent to be governed by its religious rules.

As we stated at the outset of this opinion, we hold that once petitioners terminated their affiliation with the Church, they were not bound to its dispute resolution procedures to resolve the claims at issue here, which are based on alleged tortious conduct occurring after their separation from the Church and do not implicate resolution of ecclesiastical issues.[22]

Scientology argues that petitioners simply agreed to be bound by Scientology dispute resolution procedures no matter what. As Scientology puts it, "An '***irrevocable***' agreement to '***forever***' waive civil proceedings and submit to Scientology

[22]     We do not express an opinion on either of two matters. First, whether arbitration could properly be compelled if petitioners were to bring claims for acts occurring while they were church members. Second, whether evidence of conduct allegedly occurring prior to petitioners' separation from the church is admissible at trial.

Ethics and Justice Codes in 'any dispute' with Churches of Scientology is a condition for participation in the religion." It argues that this agreement should be enforced like any other agreement. Enforcing this provision without regard to petitioners' First Amendment rights would mean that if the Church or a Church member committed any intentional or negligent tort against a former member of the Church, that former member would be bound by Scientology dispute resolution procedures regardless of the fact that the member had left the Church years, even decades, before the tort. In effect, Scientology suggests that one of the prices of joining its religion (or obtaining a single religious service) is eternal submission to a religious forum – a sub silencio waiver of petitioners' constitutional right to extricate themselves from the faith.[23] The Constitution forbids a price that high.

### DISPOSITION

The petition is granted. Let a writ of mandate issue directing respondent court to vacate its order granting the Church's petitions to compel arbitration and enter a new and

---

[23] Courts must closely scrutinize waivers of constitutional rights, and indulge every reasonable presumption against a waiver of First Amendment rights, which may only be made by a clear and compelling relinquishment. (*No Doubt v. Activision Publishing, Inc.* (2011) 192 Cal.App.4th 1018, 1035, fn. 7.) The parties did not brief whether the language of the agreement constitutes a clear and compelling relinquishment of the right to leave the faith and/or the concomitant right to withdraw consent to be ruled by the faith. On their face these agreements do not purport to waive petitioners' right to leave the church.

different order denying the motions.  Petitioners shall recover their costs.



RUBIN, P. J.

I CONCUR:


MOOR, J.

Chrissie Bixler v. The Superior Court of Los Angeles County
B310559


BAKER, J., Concurring



I join the opinion of the court, with the exception of Part 3 of the Discussion section.



BAKER, J.